[No. A077911. First Dist., Div. Four. Feb. 16, 1999.]

WILLIAM YU et al., Plaintiffs and Appellants, v.
SIGNET BANK/VIRGINIA et al., Defendants and Respondents.

1380

COUNSEL

The Sturdevant Law Firm, James C. Sturdevant, Kim E. Card; and William E. Kennedy for Plaintiffs and Appellants.

Morrison & Foerster, Kathleen V. Fisher, James F. McCabe and Annemarie C. O'Shea for Defendants and Respondents.

OPINION

HANLON, P. J.—Appellants William and Darlene Yu filed this action individually and on behalf of others similarly situated against respondents Signet Bank/Virginia and Capital One Bank challenging respondents' debt collection practices with respect to credit cards they issued to California residents. This appeal arises from the judgment entered for respondents after their motion for summary judgment was granted. We reverse the judgment as to appellants' abuse of process and unlawful business practice claims, and affirm as to the other causes of action.

I. BACKGROUND

Respondents are Virginia corporations with their principal places of business in Virginia. Appellants lived in Fremont, California during the events at issue in this lawsuit.

In 1989, appellants accepted a Signet credit card in response to a pre-approved solicitation they received in the mail. When they signed up for the credit card, appellants executed a certificate accepting terms and conditions which provided that payments on the card would be made to a Virginia address, and that the credit agreement would be governed by Virginia and federal law.

Appellants used the credit card to purchase goods and services primarily for personal, family and household purposes. They never went to Virginia or used the credit card in Virginia. They failed to make payments owed on the card in 1990, and the account was declared delinquent.

Signet had what it called a "long-arm program" for dealing with out-of-state debtors who defaulted on their credit cards. This "long-arm program" was to file collection suits in Virginia state district trial courts against cardholders from other states. The "long-arm program" was begun by Signet around 1983 and carried on by Capital One from March of 1995, after a

"spin-off" of Signet's credit card operations to Capital One. More than 90 percent of respondents' long-arm suits resulted in default judgments against the cardholders.

When a Virginia suit was filed, respondents sent what they called a "change of jurisdiction" letter to the out-of-state cardholder. The letter advised the cardholder that "[w]e intend to file suit against you in Virginia," and that "[i]f you would prefer the trial to be in your state, we must receive written notice from you within twenty-one days of this letter." If the cardholder requested a change of jurisdiction within the specified time limit, then the Virginia action would be dismissed. Out-of state cardholders who indicated that they could not appear in court for "lack of money; too far to travel; etc." were not considered to have made a valid request for change of jurisdiction, and the Virginia suits would proceed against those customers.

One of respondents' criteria for determining whether a long-arm suit would be filed was whether the cardholder had a "garnishable place of employment." If the cardholder's employer had an office in Virginia, then respondents would serve a postjudgment wage garnishment order on the employer in Virginia.

Respondents' collection guidelines listed "[p]eople in the limelight, celebrities, attorneys" among the cardholders who were "Not candidates for Legal Action." In his deposition, a Capital One vice-president testified that suing out-of-state attorneys was regarded as "a bad business decision." With respect to "celebrities," the officer said that "we didn't want to expose the company to any press because we hadn't done everything we needed to do." A document produced in connection with the officer's deposition listed "Class Action Risk" among the "Real & Assumed Cost[s]" of the long-arm program in 1994. "Signet needs to realize the potential risk of a class action suit," the document stated, "and do the right thing in order to prevent a future loss to the bank."

Appellants did not hear from Signet for four years, but began receiving collection notices on the account in mid-1994. It is disputed whether appellants received a "change of jurisdiction" letter advising that Signet intended to sue them in Virginia.

Around August of 1994, appellants received a document in the mail entitled "Warrant In Debt," stating that they owed Signet $2,191.38, plus interest at the rate of 19.8 percent from March of 1991. The Warrant In Debt had been filed in the state district court in Richmond, Virginia, and was the equivalent of a California civil summons and complaint. Signet had served

the Warrant In Debt on appellants, as nonresidents of Virginia, by lodging it with the Secretary of the Commonwealth of Virginia. The back of the document advised defendants that they could "move to object to venue" by filing a written request to have the case moved to a different "general district court." Appellants have testified that they did not understand the nature or legal effect of the Warrant In Debt.

Signet obtained a default judgment against appellants in the Richmond district court on August 9, 1994, and a "garnishment summons" from that court in October 1994. Signet served the garnishment summons on the Hampton, Virginia office of appellant William Yu's employer, Silicon Graphics. An instruction on the form directed that it be forwarded to Silicon Graphics' office in Mountain View, California where Mr. Yu worked. From November 1994 to May 1995, a total of approximately $3,900 was garnished from Mr. Yu's wages in Mountain View.

Appellants filed their class action suit against respondents herein in July of 1995. Their second amended complaint asserted eight causes of action, for: (1) tortious violation of Code of Civil Procedure section 395, subdivision (b), which specifies the venue for actions on consumer contracts; (2) abuse of process; (3) tortious violation of Code of Civil Procedure sections 1710.10 et seq. and 1913, subdivision (a), which establish the procedure for enforcing foreign judgments; (4) violation of due process; (5) restitution and injunctive relief under Business and Professions Code section 17200 for an unlawful, unfair or fraudulent business practice; (6) violation of Civil Code section 1788.15, which outlaws certain consumer debt collection practices; (7) negligent infliction of emotional distress; and (8) intentional infliction of emotional distress.

Shortly after this class action was filed Capital One ended the "long-arm program." Capital One's "Risk Operations" department wrote a memorandum dated November 22, 1995, to the collections staff, stating that "[t]he Bank will no longer file nor threaten to file long-arm lawsuits . . . . If the Bank decides to take legal action against a debtor, we will file suit in the Court whose jurisdiction and venue are appropriate to that debtor's domicile. . . . [¶] The Bank will not garnish property in any case where the Bank holds a long-arm judgment against a debtor. If the Bank has obtained a judgment against a debtor in the Court whose jurisdiction and venue are appropriate to the debtor's domicile, we will only garnish property in or through that Court."

Respondents moved for summary judgment or summary adjudication in December 1996, and the motion for summary judgment was granted in

February 1997. The court adopted in full respondents' proposed order granting the motion for summary judgment, adding the words we have placed in italics:

"1. The Court holds as a matter of law that Plaintiffs state no cause of action against Defendants. Defendants obtained and enforced a judgment in Virginia in accordance with Virginia laws *and the Commonwealth of Virginia had personal jurisdiction over the defendants* [*sic* (the court presumably meant to say "plaintiffs," because Virginia's jurisdiction over the defendant banks was not at issue)]. It is irrelevant that Defendants did not domesticate the Virginia judgment in California pursuant to Code of Civil Procedure § 1913 and the Sister State Money Judgment Act, Code of Civil Procedure § 1710, et seq. [*sic*], because Defendants did not attempt to garnish Plaintiff's wages in California. The situs of Plaintiff's debt for garnishment purposes was not only California, the state of Plaintiff's residence, but also Virginia, the state in which his employer Silicon Graphics—the garnishee—could be found. State of Oregon v. Control Data Corp. (Or. 1986) 713 P.2d 30, 32. The proper forum to address Plaintiffs' jurisdictional challenges is *the appellate courts of the Commonwealth of Virginia,* not this Court.

"2. Plaintiffs as a matter of law are not entitled to seek affirmative relief against Defendants for failure to comply with Code of Civil Procedure § 1913 and the Sister State Money Judgment Act, Code of Civil Procedure § 1710, et seq. Defendants may not be held liable under California law for conduct in Virginia that is legal under Virginia law, regardless of whether that same conduct would or would not be legal under California law. (World Wide Imports v. Bartel (1983) 145 Cal.App.3d 1006 [193 Cal.Rptr. 830].)

"3. *Causes of action for emotional distress do not lie for economic losses.*"

The court entered judgment for respondents, and did not rule on a pending motion for class certification. The class certification motion was supported by evidence that, during the proposed class period from July 15, 1991, respondents had obtained at least 7,575 judgments in Virginia courts against 8,812 California residents, and collected at least $3.5 million on those accounts.

## II. DISCUSSION

### A. *Jurisdiction of the Virginia Court*

 The threshold issues in this appeal concern the jurisdiction of the Virginia state district court over appellants in Signet's collection action. The

grant of summary judgment rested largely on two conclusions: (1) that the Virginia court had personal jurisdiction over appellants; and (2) that appellants could not properly raise the jurisdictional issue except in a Virginia court. These conclusions are contradictory: if the issue of jurisdiction could only be addressed in Virginia, then the court's finding on the point was improper and unnecessary. In any event, however, if these conclusions are incorrect then most of the summary judgment cannot be upheld on its stated grounds.

A judgment of a court lacking personal jurisdiction is a violation of due process, and it is null and void everywhere, including the state in which it is rendered. (*Burnham* v. *Superior Court of Cal., Marin County* (1990) 495 U.S. 604, 609 [110 S.Ct. 2105, 2109-2110, 109 L.Ed.2d 631]; *Underwriters Assur. Co.* v. *N. C. Guaranty Assn.* (1982) 455 U.S. 691, 705, fn. 10 [102 S.Ct. 1357, 1366, 71 L.Ed.2d 558]; *World Wide Volkswagen Corp.* v. *Woodson* (1980) 444 U.S. 286, 291 [100 S.Ct. 559, 564, 62 L.Ed.2d 490]; *Pennoyer* v. *Neff* (1877) 95 U.S. 714, 732 [24 L.Ed. 565, 572].) Thus, if the Virginia state district court did not have personal jurisdiction over appellants, the default judgment was void, and the Virginia "garnishment summons" predicated on that judgment was void as well, regardless of the "situs" of appellants' debt for garnishment purposes. Respondents' defense and the court's apparent finding that respondents' conduct was "legal under Virginia law" also hinged on the validity of the default judgment. If the Virginia judgment was a nullity then that defense and that finding would be insupportable.

Respondents submit that any inquiry into the Virginia court's jurisdiction would be improper.[1] However, respondents have placed that court's jurisdiction in issue by arguing that we are bound to give its judgment full faith and credit. It is settled that a judgment is not entitled to full faith and credit unless the rendering court had jurisdiction to render the judgment. (*Underwriters Assur. Co.* v. *N. C. Guaranty Assn., supra,* 455 U.S. at p. 704 [102 S.Ct. at pp. 1365-1366]; *Washoe Development Co.* v. *Guaranty Federal Bank* (1996) 47 Cal.App.4th 1518, 1521 [55 Cal.Rptr.2d 479].) "Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree." (*Underwriters Assur. Co.* v. *N. C. Guaranty Assn., supra,* 455 U.S. at p. 705 [102 S.Ct. at p. 1366].) We may therefore address the jurisdictional issue.

Respondents argued to the trial court that appellants were precluded from challenging the Virginia court's jurisdiction because they "slept on their

---

[1]Respondents' related contention that appellants cannot challenge the Virginia court's jurisdiction in order to obtain "affirmative relief" is discussed below.

rights," and "knowingly ignored every opportunity they had to make a timely objection to the pre-judgment proceedings." However, "[a] defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." (*Insurance Corp.* v. *Compagnie Des Bauxites* (1982) 456 U.S. 694, 706 [102 S.Ct. 2099, 2106, 72 L.Ed.2d 492].) Appellants did not waive their jurisdictional objection by failing to respond to Signet's "change of jurisdiction" letter or ask the Virginia court for a change of venue, and respondents appear to have abandoned their waiver argument on appeal.

Respondents note that California does not have authority to vacate the judgment of a sister state, even one that is void, and they contend that a foreign court's jurisdiction cannot be considered unless enforcement of the judgment is sought. However, appellants are not seeking to vacate the Virginia judgment, and there is no authority supporting respondents' proposed limitation on jurisdictional challenges to sister state judgments. As Virginia's own Supreme Court has observed, " 'if a judgment is void, it may be assailed anywhere, at any time, in any way, by anybody.' " (*Slaughter* v. *Com.* (1981) 222 Va. 787 [284 S.E.2d 824, 827].) Whenever a foreign judgment is raised as a defense, the court in the subsequent case can consider whether the court that rendered the judgment had the jurisdiction to do so. (See, e.g., *Underwriters Assur. Co.* v. *N. C. Guaranty Assn.*, *supra*, 455 U.S. at pp. 701-714 [102 S.Ct. at pp. 1364-1371].)

The jurisdictional issue thus presented with respect to respondents' "long arm program" was resolved against them in *Signet Bank/Virginia* v. *Tillis* (1990) 196 Ga.App. 433 [396 S.E.2d 54]. In that case, Signet obtained a default judgment in Virginia against a Georgia cardholder, and sought to enforce the judgment in Georgia. The operative facts in *Tillis* were identical to those in appellants' case. The cardholder had no contacts with Virginia other than returning Signet's pre-approved solicitation to that state, receiving extensions of credit from that state, and mailing payments to that state. The Georgia Court of Appeals found those contacts insufficient under *Burger King Corp.* v. *Rudzewicz* (1985) 471 U.S. 462 [105 S.Ct. 2174, 85 L.Ed.2d 528], and other cases to give the Virginia court personal jurisdiction over the cardholder. The court noted that " '[w]here the nonresident defendant, like the purchaser from a 'mail order house,' is truly the passive party, courts have ordinarily refused to recognize jurisdiction.' " (*Signet Bank/Virginia* v. *Tillis, supra,* 396 S.E.2d at p. 56, quoting *Money-Line, Inc.* v. *Cunningham* (1981) 80 A.D.2d 60 [437 N.Y.S.2d 816, 819].)

■ *Tillis* reached the correct conclusion under well-established principles. As a matter of due process, personal jurisdiction over a defendant

who is outside the forum requires that "he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" (*Internat. Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [66 S.Ct. 154, 158, 90 L.Ed. 95, 161 A.L.R. 1057].) It must appear that such defendant has "'purposefully directed' his activities at residents of the forum" (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at p. 472 [105 S.Ct. at p. 2182]) "'such that he should reasonably anticipate being haled into court there'" (*id.* at p. 474 [105 S.Ct. at p. 2183]). With respect to interstate contracts, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state'" are subject to the latter state's jurisdiction. (*Id.* at p. 473 [105 S.Ct. at p. 2182]; see, e.g., *Vons Companies, Inc.* v. *Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 453 [58 Cal.Rptr.2d 899, 926 P.2d 1085] [upholding jurisdiction over defendants who "sought out and maintained a continuing commercial connection with a California business"].) However, a contract with an out-of-state party does not alone automatically confer jurisdiction on the other party's home forum. (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at p. 478 [105 S.Ct. at p. 2185].) "'Fortuitous,' or 'attenuated'" contacts with the forum are insufficient (*id.* at p. 475 [105 S.Ct. at p. 2183]), and "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent" (*id.* at p. 478 [105 S.Ct,. at p. 2185]).

*Burger King* found that a Florida court had personal jurisdiction over a Michigan franchisee in a suit by a Florida franchisor arising from their franchise agreement. The opinion noted that the franchisee was an "'experienced and sophisticated'" businessperson, who had been represented by counsel during the months of negotiations that led to the franchise agreement. (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at pp. 484-485 [105 S.Ct. at pp. 2188-2189].) "Eschewing the option of operating an independent local enterprise, [the franchisee] deliberately 'reached out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." (*Id.* at pp. 479-80 [105 S.Ct. at p. 2186].) The franchise agreement involved "complex transactions" (*id.* at p. 485 [105 S.Ct. at p. 2189]), and was "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida" (*id.* at p. 480 [105 S.Ct. at p. 2186]). A choice-of-law provision in the agreement, "combined with the 20-year interdependent relationship . . . reinforced [the franchisee's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." (*Id.* at p. 482 [105 S.Ct at p. 2187].)

 The situation here is materially different from the one in *Burger King*. This case involves a simple consumer transaction, not a complex commercial enterprise. Signet was the one that "deliberately reached out" to initiate business with appellants, and no "wide-reaching" contacts between them were ever contemplated. Insofar as it appears from the record, appellants are merely unsophisticated consumers who responded to Signet's credit card solicitation, used the card and made payments on the card. In so doing, we do not think they "deliberately affiliated" themselves with Virginia in any meaningful sense, or that they would have reasonably foreseen the need to go there to defend themselves in any dispute arising from the credit agreement.

Consumer transactions like the one here were expressly distinguished in *Burger King*. The court was "concern[ed]" that the case not lead to "the exercise of jurisdiction over 'out-of-state consumers to collect payments due on modest personal purchases.' " (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at pp. 484-485 [105 S.Ct. at p. 2189].) Therefore, the opinion went on to "emphasize[] that jurisdiction may not be grounded on a contract . . . whose application would render litigation 'so gravely difficult and inconvenient that [a party] will for all practical purposes be deprived of his day in court.' . . . [J]urisdictional rules may not be employed against small consumers so as to 'crippl[e] their defense' . . . . Just as the Due Process Clause allows flexibility in ensuring that commercial actors are not effectively 'judgment proof' for the consequences of obligations they voluntarily assume in other States, . . . so too does it prevent rules that would unfairly enable them to obtain default judgments against unwitting customers. . . . [The] court must not be ' "blind" ' to what ' "[a]ll others can see and understand" ' . . . ." (*Id.* at p. 486 [105 S.Ct. at pp. 2189-2190], citations omitted.)

Appellants are plainly in the class of "unwitting customers" the *Burger King* court sought to protect. They had no relationship with Virginia other than their credit card, and it was fundamentally unfair to expect them to travel thousands of miles to litigate matters concerning their account. *Burger King* thus supports our conclusion and that of the *Tillis* court that the Virginia judgments against respondents' distant out-of-state cardholders were in excess of jurisdiction.

Accordingly, the Virginia judgment afforded no basis for the grant of summary judgment, and we must proceed to consider whether the judgment can be upheld as to any of the causes of action on other grounds. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, pp. 382-383 [judgment must be affirmed if correct on any legal theory].)

B. *Abuse of Process and Unlawful Business Practice Claims*

In *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 98 [101 Cal.Rptr. 745, 496 P.2d 817], our Supreme Court held that a creditor who files consumer debt collection actions in an improper venue, knowing that the venue is improper, for the purpose of impairing the debtors' ability to defend themselves, is guilty of "a gross 'abuse of process' " and an " 'unlawful . . . business practice' " within the meaning of what is now Business and Professions Code section 17200. In support of this conclusion, the court observed that the venue rules for relatively small claims stemmed from "recognition of the serious potential for harassment that arises if a plaintiff, in a small monetary action, commences his action in a distant forum. . . . [D]efendants in such cases will often be financially unable to expend the money to travel to a distant forum, or to hire an attorney to do so, even simply to move for a change of venue. Without the protection of [the venue statute], a plaintiff, aware of these practical limitations, could exploit the situation by filing all such actions in distant counties where a defendant could not afford either to defend or to move for change of venue, and could thereby unfairly obtain default judgments or favorable settlements in such actions." (7 Cal.3d at p. 118.)

The practice of "distant forum abuse" (see generally, Chen, *Due Process as Consumer Protection: State Remedies for Distant Forum Abuse* (1986) 20 Akron L.Rev. 9, 10-13) alleged in appellants' case is even worse than the one condemned in *Barquis*, because the practice there involved suits in the wrong venue within California, whereas the practice here involves suits in the wrong *jurisdiction*—the even more distant forum of another state. In *Barquis* a demurrer had been sustained without leave to amend, so the court was required to accept the truth of the facts pled (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]), whereas here, where a summary judgment was granted, the evidence must be viewed in the light most favorable to appellants' claims (*Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264]). Apart from these differences, which are of no assistance to respondents, *Barquis* is not distinguishable.

The venue statutes applied in *Barquis* required that the collection suits be filed in the county where the debtor lived, or the county where the contract was formed or to be performed, and the creditor was required to state facts under oath demonstrating that the venue was proper. The creditor in *Barquis* filed verified form complaints which simply alleged on information and belief that the account was "payable" in the county where the suit was filed. This allegation did not satisfy the requirement that proper venue be shown, the venue was in fact improper, and the debtors alleged that the venue

allegation was kept deliberately vague to conceal that fact from the court. It thus appeared that the creditor had "knowingly and willfully instituted actions against consumers in the wrong county, under inadequate complaints, for the ulterior purpose of impairing these individuals' defenses of the action and with the intent of securing default judgments by virtue of the inconvenience of the improper forum." (*Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at p. 103.)

Similarly here, appellants submit that respondents sued California cardholders in Virginia, knowing, at least after the decision in the *Tillis* case, that any judgment they might obtain against them would be void for lack of jurisdiction. Respondents did so, appellants contend, knowing that the Californians would be unlikely to appear, in order to use the default judgments to obtain improper garnishment orders and settlement leverage. The evidence shows that respondents obtained thousands of default judgments and collected millions of dollars through their long-arm program. The evidence suggests that respondents may have consciously taken a "class action risk," in the hope that it could be avoided if no action were taken against people like attorneys and "celebrities" who might challenge or publicize the program. Viewed in the light most favorable to appellants' abuse of process claim, the record raises triable issues of fact concerning respondents' knowledge and intent which cannot be resolved on a motion for summary judgment.

Respondents contend that *Barquis* is distinguishable "given Signet's compliance with Virginia procedures and clear Virginia precedent approving Signet's action." However, there is no such "clear Virginia precedent." Respondents' assertion is based entirely on letters or orders, all apparently unpublished, by judges from the state district court in Richmond, Virginia. In 1986, Judge Wimbish wrote to the parties in a case involving a credit card issued to an out-of-state resident by the Bank of Virginia, and explained the reasons for his denial of the cardholders' motion to dismiss for lack of jurisdiction. In 1988, another judge wrote the parties in another Bank of Virginia case and adopted Judge Wimbish's reasoning by reference. In 1993, another judge filed an order denying a motion to set aside a default judgment obtained by Signet against an individual who was living in Florida. The order does not indicate whether the case involved a credit card.

Respondents cite no authority demonstrating that these trial court letter opinions and orders had any force of precedent in Virginia. "The question . . . is not what a trial court intended in a particular case but the preclusive effect *its* judgment has under the controlling legal principles of its own State" (*Baker* v. *General Motors Corporation* (1998) 522 U.S. 222, ___ [118

S.Ct. 657, 671, 139 L.Ed.2d 580] (conc. opn. of Kennedy, J.)), and the Virginia Supreme Court has opined that a trial court's view of its own jurisdiction is "never conclusive" (*Slaughter* v. *Com.*, *supra*, 284 S.E.2d at p. 827). No Virginia appellate court has approved the exercise of "long-arm" jurisdiction over out-of-state consumers for debt collection purposes.

Thus, respondents cannot escape liability for distant forum abuse simply because they managed to persuade some local judges to go along with their scheme. While this fact may constitute some evidence on the question of whether respondents recognized that their actions were unlawful, it does not establish that there was ever any Virginia law that purported to approve of what they were doing.

Respondents advance various reasons why they cannot be held liable in California for an abuse of process that occurred in another state. These arguments are untenable.

Respondents submit that no abuse of process can be found because California cannot "regulate" conduct "that is lawful in other states." We are not persuaded that respondents' long-arm program was "lawful" in Virginia, but there is no merit to respondents' sweeping assertion in any event. In the absence of any federal preemption, a defendant who is subject to jurisdiction in California and who engages in out-of-state conduct that injures a California resident may be held liable for such conduct in a California court. (See, e.g., *Vons Companies, Inc.* v. *Seabest Foods, Inc.*, *supra*, 14 Cal.4th at pp. 476-477; *Quattrone* v. *Superior Court* (1975) 44 Cal.App.3d 296, 303-307 [118 Cal.Rptr. 548]; *People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 776-777 [20 Cal.Rptr. 516].) It is irrelevant whether the conduct was lawful in other states.[2]

Respondents' sole authority to the contrary, *BMW of North America, Inc.* v. *Gore* (1996) 517 U.S. 559 [116 S.Ct. 1589, 134 L.Ed.2d 809], confirms this point. In that case, an Alabama jury awarded punitive damages against BMW under Alabama law for failing to tell an Alabama purchaser that the new car he bought had been repainted. BMW followed a nationwide policy of not advising its dealers of damage to new cars when the cost of

[2]Choice of law principles may dictate that California law be applied to out-of-state conduct, even if the conduct is permissible there (see, e.g., *Application Group, Inc.* v. *Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 894-905 [72 Cal.Rptr.2d 73]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 328 et seq.), and in that sense California may also "regulate" conduct which is "lawful" in other states. Respondents do not seek to defend the judgment based on the choice of law provision in the credit agreement, and could not do so because there is no Virginia or federal law permitting their "long-arm" practice.

repair did not exceed 3 percent of the suggested retail price. There are different rules throughout the country governing disclosures of new car repairs, and BMW's policy was consistent with the laws of many states. The jury arrived at the punitive damage award by multiplying the plaintiff's compensatory damages by the number of similar sales in other jurisdictions. The court held that the punitive damages were improper to the extent that they were based on BMW's conduct outside of Alabama.

The court acknowledged that Alabama had a legitimate interest in protecting its own citizens from deceptive trade practices, but concluded that "principles of state sovereignty and comity" prevented the imposition of punitive damages "with the intent of changing the tortfeasors' lawful conduct in other States." (*BMW of North America, Inc.* v. *Gore, supra,* 517 U.S. at pp. 568, 572 [116 S.Ct. at pp. 1595, 1597].) "[B]y attempting to alter BMW's nationwide policy, Alabama would be infringing on the policy choices of other States. To avoid such encroachment, the economic penalties that a State such as Alabama inflicts on those who transgress its laws . . . *must be supported by the State's interest in protecting its own consumers and its own economy.* Alabama may insist that BMW adhere to a particular disclosure policy in that State. Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred *and that had no impact on Alabama or its residents.* Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions." (*Id.* at pp. 572-573 [116 S.Ct. at pp. 1597-1598], italics added, fn. omitted.) Thus, the punitive damages could be awarded "with consideration given only to the interests of Alabama consumers, rather than those of the entire Nation." (*Id.* at p. 574 [116 S.Ct. at p. 1598].)

The *BMW* case would thus prohibit an award of punitive damages herein to punish or deter respondents' conduct with respect to consumers in states other than California. However, appellants are not seeking any such award. *BMW* establishes that California may indeed protect its own consumers, and punish the conduct of an out-of-state defendant if it has an impact on them regardless of whether the conduct might be lawful elsewhere.

Respondents note that appellants' abuse of process and unlawful business practice claims are based on a sister state judgment, and maintain that principles of sovereignty and comity require that such judgments not furnish a basis for liability. This argument is grounded on the false assumption that the judgment in question was "lawful" and "valid" in Virginia. (*World Wide Volkswagen Corp.* v. *Woodson, supra,* 444 U.S. at p. 291 [100 S.Ct. at p. 564] [judgment in excess of jurisdiction is void where rendered].) ██ It has been "repeatedly stated [that] California must, regardless of policy

objections, recognize the judgment of another state as res judicata, and this is so even though the action or proceeding which resulted in the judgment could not have been brought under the law or policy of California." (*World Wide Imports, Inc.* v. *Bartel* (1983) 145 Cal.App.3d 1006, 1011 [193 Cal.Rptr. 830].) However, that recognition is required only where the judgment is a "valid" one (*ibid.*; see also *Tyus* v. *Tyus* (1984) 160 Cal.App.3d 789, 793 [206 Cal.Rptr. 817]), and, as previously explained, the judgment here was "an absolute nullity." (*Pennoyer* v. *Neff, supra,* 95 U.S. at p. 732 [24 L.Ed. at p. 572].) It has been held that "[w]here another state has fully and fairly litigated its jurisdiction, and has finally decided the question, a second state may not reexamine the question." (*St. Sava Mission Corp.* v. *Serbian Eastern Orthodox Diocese* (1990) 223 Cal.App.3d 1354, 1364 [273 Cal.Rptr. 340].) However, jurisdiction was not litigated in the proceedings that resulted in the default judgment against appellants.

Respondents contend that, even if a California court could properly inquire into the validity of the Virginia judgment in a proceeding to enforce the judgment, such an inquiry cannot be used "to award affirmative relief." Respondents posit the following "endless round of judicial Paper/Rock/Scissors" if a right of action is authorized on the basis of an invalid foreign judgment: "Litigant A sues B in Texas. B either ignores the suit or contests personal jurisdiction and loses the argument. A obtains a judgment in Texas for $100,000. Undeterred, B sues A in Ohio, claiming that the Texas proceedings were void, and an abuse of process. Ohio agrees with B and disagrees with the Texas court on the issue of personal jurisdiction over B in Texas. The Ohio court enters judgment for B for $100,00, the damages suffered by the consequences of the 'unlawful' proceedings in Texas, whereupon, A files suit in Nebraska, alleging that Texas was right and Ohio was wrong. And so on."

In respondents' view, "[t]he Full Faith and Credit Clause prevents this sort of cross-border tug-of-war by requiring state courts to restrain from reviewing decisions of foreign state courts except where the second court is called upon to lend aid to the enforcement of the foreign state's prior judgment." Again, however, there is no authority under the full faith and credit clause for this proposed limitation on sister states' ability to examine each other's jurisdiction to render a judgment. As previously noted, if the issue with respect to a judgment is whether it is entitled to full faith and credit, then an inquiry can always be made into the subject matter and personal jurisdiction of the rendering court. (*Underwriters Assur. Co.* v. *N. C. Guaranty Assn., supra,* 455 U.S. at p. 705 [102 S.Ct. at p. 1366].) The scenario respondents posit should never arise in any event, and nothing in our decision should cause it to occur.

Once an issue has been finally determined by a court with " 'jurisdiction, in the fundamental sense, over the subject matter and the parties' " (*Barquis* v. *Merchants Collection Assn., supra*, 7 Cal.3d at p. 120), the decision "qualifies for recognition" throughout the land. (*Baker* v. *General Motors Corporation, supra*, 522 U.S. at p. __ [118 S.Ct. at p. 664].) This recognition is required even if the issue is itself whether the rendering court had this "fundamental" jurisdiction. (*St. Sava Mission Corp.* v. *Serbian Eastern Orthodox Diocese, supra*, 223 Cal.App.3d at p. 1364.) It is also required once the jurisdictional issue has been "fully and fairly litigated" between the parties. (*Durfee* v. *Duke* (1963) 375 U.S. 106, 111 [84 S.Ct. 242, 245, 11 L.Ed.2d 186].) Full faith and credit "generally requires every State to give to a judgment at least the *res judicata* effect which the judgment would be accorded in the State which rendered it." (*Id.* at p. 109 [84 S.Ct. at p. 244].) Thus, if defendant B in the first suit in the hypothetical had in fact appeared in that case, contested personal jurisdiction and lost, then B would be collaterally estopped from relitigating the issue in a different forum. The court in the second case would be bound to accept the prior judgment on the matter, even if it were inclined to disagree with it. (*St. Sava Mission Corp.* v. *Serbian Eastern Orthodox Diocese, supra*, 223 Cal.App.3d at p. 1364.)

The Virginia court's jurisdiction is an open issue in this case because it has not previously been litigated between the parties, and a California court is therefore free to resolve the issue according to its own best judgment. Since it is conceded that we have the fundamental jurisdiction to do so, and the matter is being fully and fairly litigated herein, our determination will be entitled to full faith and credit elsewhere. Thus, the matter should end here, in California, when the case becomes final. The losing party could no more relitigate the question in another state than in another action in California. (*Durfee* v. *Duke, supra*, 375 U.S. at p. 109 [84 S.Ct. at p. 244].)

We conclude that *Barquis*'s holding can be applied to respondents' conduct, even though the distant foreign abuse occurred in another state and involved the procuring of a foreign judgment. Since respondents have no dispositive arguments or evidence in their favor on the abuse of process and unlawful business practice claims, summary judgment was erroneously granted as to those causes of action.[3]

---

[3]For purposes of the trial of those claims, we note that appellants can argue that respondents' long-arm practice was both "unlawful" and "unfair" within the meaning of Business and Professions Code section 17200. The *Barquis* court found it unnecessary to determine whether the distant forum abuse in that case was "unfair" as well as unlawful. However, as we have observed, the abuse in this case was even worse than the practice labeled "gross" in *Barquis*. (*Barquis* v. *Merchants Collection Assn., supra*, 7 Cal.3d at p. 98.) If follows from our

## C. *Other Statutory Violations*

The first cause of action in appellants' complaint is for violation of Code of Civil Procedure section 395, subdivision (b), which provides in relevant part: "Subject to the power of the court to transfer actions or proceedings as provided in this title, in an action arising from an offer or provision of goods, services, loans or extensions of credit intended primarily for personal, family or household use, . . . the county in which the buyer or lessee resided at the time the contract was entered into, or the county in which the buyer or lessee resides at the commencement of the action is the proper county for the trial thereof." Appellants contend that Signet violated this venue statute by suing them in Virginia.

The third cause of action in the complaint is for violation of Code of Civil Procedure section 1710.10 et seq., which set forth the procedures for entry of a California judgment based on a sister state judgment, and Code of Civil Procedure section 1913, subdivision (a), which provides in pertinent part that ". . . the effect of a judicial record of a sister state is the same in this state as in the state where it was made, except that it can only be enforced in this state by an action or special proceeding." Appellants contend that Signet violated these statutes when it enforced the Virginia judgment by serving a wage garnishment order in Virginia, rather than domesticating the judgment in California as provided in these statutes.

The sixth cause of action is for violation of Civil Code section 1788.15, which states that: "(a) No debt collector shall collect or attempt to collect a consumer debt by means of judicial proceedings when the debt collector knows that service of process, where essential to jurisdiction over the debtor or his property, has not been legally effected. [¶] (b) No debt collector shall collect or attempt to collect a consumer debt, other than one reduced to judgment, by means of judicial proceedings in a county other than the county in which the debtor has incurred the consumer debt or the county in which the debtor resides at the time such proceedings are instituted, or resided at the time the debt was incurred." (Civ. Code, § 1788.15.) Appellants contend that Signet violated these provisions of the Robbins-Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.) by suing them in Virginia before their debt was otherwise "reduced to judgment," and by improperly garnishing Mr. Yu's wages.

The Robbins-Rosenthal Fair Debt Collection Practices Act provides for recovery in an individual action of the debtor's actual damages, as well as

---

discussion of due process that obtaining default judgments in the wrong jurisdiction, if done with the requisite conscious intent, was a fundamentally unfair business practice.

reasonable attorney's fees and costs, plus a fine of $100 to $1,000 if the creditor's violation is willful and knowing. (Civ. Code, § 1788.30.) Appellants seek tort damages for the alleged violations of the Code of Civil Procedure under the theory that " '[v]iolation of a statute embodying a public policy is generally actionable even though no specific remedy is provided in the statute; any injured member of the public for whose benefit the statute was enacted may bring an action.' . . . [¶] The effect of such statutes, in essence, is to create a duty or standard of conduct, the breach of which, where it causes injury, gives rise to liability in tort." (*Castillo* v. *Friedman* (1987) 197 Cal.App.3d Supp. 6, 14 [243 Cal.Rptr. 206] [citations omitted]; see *Czap* v. *Credit Bureau of Santa Clara Valley* (1970) 7 Cal.App.3d 1, 6 [86 Cal.Rptr. 417] [recognizing tort action for violation of former unfair debt collection practice statute]; Debt Collection Tort Practice (Cont.Ed.Bar 1971) pp. 84-86.) We need not decide whether damages are recoverable under this theory because these statutes are inapplicable in appellants' case in any event.

In our view, none of these statutes was meant to govern conduct outside of California. As previously explained, there is no constitutional impediment to a finding that respondents' conduct was unlawful under Business and Professions Code section 17200. That statute has been held to preclude the particular practice at issue here—that of distant forum abuse—but it only proscribes unlawful business practices in general terms, and does not purport to direct that any particular debt collection procedure be followed here in California or elsewhere. In contrast, appellants would have us interpret the Code of Civil Procedure and Civil Code as establishing the sole means by which California consumer debts can be collected and foreign judgments can be enforced. Unlike their interpretation of Business and Professions Code section 17200, appellants' proposed interpretation of the Code of Civil Procedure and Civil Code *would* have constitutional implications.

According to appellants, Code of Civil Procedure section 395, subdivision (b) establishes the one and only venue throughout the nation where an action against a California consumer can be filed, and Civil Code section 1788.15 prohibits any judicial proceeding anywhere else until a judgment is obtained against the consumer in that local venue. Similarly, appellants would have us construe Code of Civil Procedure sections 1710.10 et seq. and 1913 to "requir[e] domestication of sister state judgments" anytime they are to be enforced against Californians. However, if appellants had traveled every month to Virginia and maintained a bank account there, then we would have a different case, in which they could have been sued on the debt in Virginia, and had their account attached in accordance with Virginia law without any

domestication of the judgment in California.[4] Nothing on the face of the statutes in question suggests that they were meant to apply to that situation, or to preclude any lawful process or debt collection practice in another state.

To construe these statutes in the manner appellants advocate could make them the kind of extraterritorial legislation the United States Constitution forbids. (See *BMW of North America, Inc.* v. *Gore, supra,* 517 U.S. at p. 571 [116 S.Ct. at p. 1597] [no state can "impose its own policy choice" on others, or " 'legislate except with reference to its own jurisdiction' "].) ▇ "[T]he fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another." (2A Sutherland Statutory Construction (1992) § 45.11, p. 49.) ▇ Accordingly, we decline to interpret these statutes to apply to conduct outside California, and conclude that summary judgment was correctly granted as the first, third and sixth causes of action.[5]

## D. *Other Claims*

▇ Appellants' seventh cause of action is for negligent infliction of emotional distress. In general, a plaintiff "incurring neither physical impact nor physical damage, and whose loss (other than emotional distress) is solely economic, is entitled neither to punitive damages nor to a recovery for emotional distress." (*Branch* v. *Homefed Bank* (1992) 6 Cal.App.4th 793, 799-800 [8 Cal.Rptr.2d 182]; see also *Smith* v. *Superior Court* (1992) 10 Cal.App.4th 1033, 1040 [13 Cal.Rptr.2d 133] [". . . mere negligence will not support a recovery for mental suffering where the defendant's tortious conduct has resulted in only economic injury to the plaintiff"].) It is undisputed that appellants suffered no physical injury as a consequence of respondents' conduct, and their case is not one of those involving "negligence of type which will cause highly unusual as well as predictable emotional distress" which are excepted from the general rule requiring physical injury. (*Branch* v. *Homefed Bank, supra,* at p. 800 [citing cases involving misdiagnosis of syphilis and mishandling of cremated remains].) Thus, summary judgment was properly granted as to the cause of action for negligent infliction of emotional distress.

▇ Summary judgment was also proper as to appellants' eighth cause of action for intentional infliction of emotion distress. Recovery on this

---

[4]Appellants' counsel effectively conceded this at oral argument on the summary judgment motion: "The Court: 'Okay. Supposing the Yus had a bank account in Virginia, would they still have . . . had to come to California to domesticate—to collect it.' [¶] [Counsel]: 'If the judgment had been valid, the Yus had a bank account, they could probably attach the bank account.' "

[5]In view of this conclusion, appellants can press no claim for abuse of process associated with violation of these statutes.

theory requires a showing of "outrageous" conduct which is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 209 [185 Cal.Rptr. 252, 649 P.2d 894].) An assertion of legal rights in pursuit of one's own economic interests does not qualify as "outrageous" under this standard. (*Trerice* v. *Blue Cross of California* (1989) 209 Cal.App.3d 878, 883 [257 Cal.Rptr. 338]; *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 67 [248 Cal.Rptr. 217].)

Appellants have abandoned their fourth cause of action for violation of due process under the California Constitution. (See *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 359 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266] [state action requirement].)

### III. CONCLUSION

The judgment in favor of respondents is reversed as to appellants' second cause of action for abuse of process and fifth cause of action for an unlawful business practice, and affirmed as to all other causes of action. The parties shall bear their own costs on appeal.

Reardon, J., and Sepulveda, J., concurred.

A petition for a rehearing was denied March 16, 1999, and respondents' petition for review by the Supreme Court was denied May 26, 1999.