Filed 9/12/14  Galvan v. Costco Wholesale Corp. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GERARDO GALVAN, | B250368 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC484314) |
| v. | |
| COSTCO WHOLESALE CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth Allen White, Judge.  Affirmed.

Avila & Shaddow, Tali Shaddow and Mark Steven Avila; Law Offices of Ellen Lake and Ellen Lake for Plaintiff and Appellant.

Seyfarth Shaw, Laura W. Shelby and Rocio Herrera for Defendants and Respondents.

In the underlying action, the trial court granted summary judgment against appellant Gerardo Galvan in his action against his former employer, respondent Costco Wholesale Corporation (Costco).  We affirm.

**RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

There are no material disputes about the following facts:  In 1999, Costco hired Galvan as a part-time employee.  In 2008, he held a senior managerial position at a Costco store in Canoga Park.  In August 2010, after receiving "counseling notice[s]" for tardiness, he was demoted to a junior managerial position and transferred to a warehouse in Simi Valley.  Soon afterward, Galvan requested leave under the Family Medical Leave Act (29 U.S.C.A. § 2601 et seq.) (FMLA), which was granted.  In March 2011, he returned to work at the Simi Valley warehouse.  In May 2011, after receiving counseling notices for tardiness and failure to perform his duties, he was terminated.

In May 2012, Galvan initiated the underlying action.  His complaint asserted claims against Costco under the California Fair Employment and Housing Act ([FEHA]; Gov. Code, § 12900 et seq.) for discrimination based on disability, failure to accommodate a disability, failure to engage in an interactive process regarding a disability, failure to prevent discrimination, and retaliation; in addition, it asserted claims for wrongful termination in violation of public policy, defamation, and intentional infliction of emotional distress, and sought punitive damages.  The complaint alleged, inter alia, that in mid-2010, Galvan began suffering from anxiety and panic, that he received medical treatment and medication for that disability during and after his leave, and that Costco engaged in misconduct regarding his disability.

In March 2013, Costco filed a motion for summary judgment or adjudication on Galvan's complaint.  In a 15-page order, the trial court determined that

summary adjudication was proper on all of his claims and his request for punitive damages, and granted the motion for summary judgment. On June 28, 2013, the court entered judgment in Costco's favor and against Galvan. This appeal followed.

## DISCUSSION

Galvan challenges the grant of summary adjudication with respect to several of his claims and his request for punitive damages. For the reasons discussed below, we reject his contentions.

### A. *Standard of Review*

"A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo. [Citations.]" (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819.) "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action -- for example, that the plaintiff cannot prove element X." (*Id*. at p. 853.)

Although we independently assess the grant of summary judgment, our inquiry is subject to several constraints. Under the summary judgment statute, we examine the evidence submitted in connection with the summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711; Code Civ. Proc., § 437c, subd. (c).) Furthermore, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,'" and thus, "'error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, italics omitted, quoting Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239.) Under this principle, Galvan bears the burden of establishing error on appeal, even though Costco had the burden of proving its right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.) For this reason, our review is limited to contentions adequately raised in Galvan's briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

The two constraints narrow the scope of our inquiry. Here, the trial court denied Galvan's request that it take judicial notice of several publications regarding mental illness and the Americans With Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.). Because Galvan does not challenge that ruling on appeal, he has forfeited any contention of error regarding it.

Galvan has also forfeited any contention that summary judgment was improper with respect to his claims, to the extent he fails to challenge the ruling regarding those claims. As Galvan does not discuss his FEHA claim for retaliation or his claims for defamation and infliction of emotional distress, we exclude them from our review. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177; *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

4

B.  *FEHA*

Galvan's principal claims arise under FEHA.  Generally, FEHA bars employers from engaging in discrimination that targets an employee on the basis of a disability or medical condition.  Under Government Code section 12940, subdivision (a)(1), it is an unlawful employment practice for an employer to discriminate against a person "because of" a physical or mental disability or a medical condition.[1]  Nonetheless, FEHA does not prohibit an employee's discharge when, "because of" his or her disability or medical condition, the employee "is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations."  (§ 12940, subds. (a)(1), (a)(2).)

FEHA also prohibits employer misconduct related to the provision of reasonable accommodations.  Under section 12940, subdivision (m), it is an unlawful employment practice for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an . . . employee." However, the employer is not required to make an accommodation "that is demonstrated by the employer . . . to produce undue hardship . . . to its operation." (§ 12940, subd. (m).)

Subdivision (n) of section 12940 imposes an additional and independent duty on employers to engage in an "interactive process" regarding reasonable accommodations.  (*Scotch v. Art Institute of California -- Orange County, Inc.* (2009) 173 Cal.App.4th 986, 1003 (*Scotch*); *Wilson v. County of Orange* (2009)

---

[1]      All further statutory citations are to the Government Code, unless otherwise indicated.

5

169 Cal.App.4th 1185, 1193 (*Wilson*); *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424 (*Wysinger*).) That provision establishes that it is an unlawful practice for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition."

Also pertinent here is subdivision (k) of section 12940, which obliges employers to prevent discrimination against employees with a disability or medical condition. Under that provision, it is an unlawful practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."[2]

C. *Underlying Proceedings*

1. *Complaint*

In assessing the grant of summary judgment, we look first at Galvan's allegations in his complaint, which frame the issues pertinent to a motion for summary judgment. (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662.) With respect to the FEHA claims, the complaint alleges that in mid-2010, Galvan began to suffer from anxiety and panic episodes. Although Galvan's supervisors were aware of Galvan's "compromised mental state," they took no

---

[2]     Although the disability-related provisions of FEHA differ in some respects from those found in the ADA, when appropriate, California courts interpreting FEHA seek guidance from federal decisions construing the ADA. (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 971-981 (*Nadaf-Rahrov*); *Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963, 973, fn. 12.)

action to make any reasonable accommodation and instead demoted and transferred him, which exacerbated his condition. After being diagnosed with a severe panic and anxiety disorder, he took a leave of absence from September 2010 to March 2011. During that leave, his medical condition was "communicated on a regular basis" to Costco. After he returned from leave, Costco terminated him because of his disability, without offering additional leave or any other reasonable accommodation, and without engaging in an interactive process, even though Costco knew that he was under a doctor's care and that his medication required adjustment.

At the outset, we observe that our review of the complaint's allegations is limited by the scope of Galvan's contentions in his opening brief. Although the complaint alleges that Costco offered no reasonable accommodations before his demotion, his opening brief on appeal maintains only that there are triable issues whether Costco contravened FEHA after he returned from his leave. We therefore limit our inquiry to the FEHA claims related to his discharge following the leave.

### 2. *Costco's Showing*[3]

In seeking summary judgment, Costco contended that Galvan's FEHA claims failed for several reasons, namely, that it was unaware Galvan had a disability, that he requested no reasonable accommodations, and that it discharged

---

[3]     Some of the evidence discussed below was submitted in conjunction with Costco's reply to Galvan's opposition, and is cited in Costco's respondent's brief on appeal. Before the trial court and on appeal, Galvan has not objected to Costco's reliance on that evidence; indeed, Galvan's reply brief also cites some of it. Accordingly, we incorporate it into our summary of Costco's showing. (See *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8 [trial court may properly consider new evidence submitted with reply brief, "so long as the party opposing the motion for summary judgment has notice and an opportunity to respond to the new material"].)

him solely because of his poor performance. Costco submitted evidence supporting the following version of the underlying facts: In 2008, Costco promoted Galvan to receiving manager, a senior managerial position that obliged him to open the Canoga Park warehouse at 4:00 a.m. At Galvan's request, Costco moved him to other managerial positions. In late 2009, Galvan asked to be moved back to the position of receiving manager, stating that "it would help with his marriage." Costco did so.

Although Galvan lived less than a mile from the Canoga Park warehouse, he was repeatedly late for work, and received two counseling notices for tardiness in June and August 2010. In issuing the second notice, Costco told him he would be demoted or discharged if he received another notice within six months. Galvan replied that he had "family issues," but would improve his performance. Eight days later, he was three hours late for work. On August 31, 2010, Costco demoted Galvan to night merchandising manager, a junior managerial position, and transferred him to the Simi Valley warehouse. Costco also warned Galvan that he would be subject to suspension pending termination if he received a notice for tardiness prior to February 20, 2011, or a notice for any other reason prior to December 22, 2010.

Immediately after the demotion, Galvan applied for personal medical leave under the FMLA, which Costco granted. Later, Galvan requested an extension of his leave to March 2011. In support of that request, Galvan submitted a notice from his physician, Dr. Alan S. Ruttenberg, stating that the extension was needed "[d]ue to illness." In early February 2011, Galvan notified Costco that he intended to return to work in March 2011.

On March 2, 2011, Galvan submitted a "work restrictions" form executed by Ruttenberg, who stated that Galvan required no restrictions. On March 7, 2011, Galvan returned to work at the Simi Valley warehouse as a night merchandising

8

manager. He generally began work at either 12:30 or 1:30 in the afternoon, and worked until the warehouse closed. His duties included communicating with other managers at the start of his shift, and securing the warehouse at closing.

Costco presented evidence that after returning, Galvan was repeatedly late for work and failed to perform his duties, but that prior to his termination in May 2011, he requested no accommodation related to an ongoing disability or medical condition. Costco's evidence included excerpts from Galvan's deposition testimony, which showed that Galvan discussed the side effects of medication he was taking with Kevin Mirrett, an assistant warehouse manager. Costco nonetheless maintained that prior to its decision to terminate Galvan, he neither requested an accommodation nor asked Ruttenberg to help him secure an accommodation.

According to Costco, Galvan was late for a managers' meeting on his first day of work after his leave. Following that meeting, Mirrett told Galvan that punctuality was very important. Nonetheless, from March 14 to May 8, 2011, Galvan was late for 28 of 38 shifts. In addition, Galvan once left the warehouse receiving door open when he left at night, and on at least one or two occasions, fellow workers were unable to call him at closing time because his radio was turned off. That conduct violated Costco's closing procedures. Galvan's co-workers complained to Mirrett and Steve Kakuk, the warehouse manager, that Galvan failed to respond to radio calls, and that his night crew did not leave the warehouse ready for business the next day.

In March and April 2011, Galvan received three counseling notices regarding his performance. The first notice, dated March 23, stated that Galvan had been late for five of the 11 shifts he had then worked. When Galvan met with Kakuk and Mirrett to discuss the notice, Kakuk told Galvan that attendance problems would not be tolerated. Kakuk further said that he and the other

9

managers would "do everything within [their] power to help [Galvan], but he ha[d] to reach out to [them] and let [them] know what he need[ed]." On the portion of the notice for employee responses, Galvan apologized for his conduct, promised to "be more proactive and ask for help when needed," and resolved to be punctual. In addition, Galvan stated: "If anything does come up[,] I will call and let a [manager] know."

Galvan testified in his deposition that after the March 23 meeting, he told Mirrett that he was having "a hard time trying to manage [himself] with the medication that [he] was taking." Galvan stated: "I was telling him that I . . . really tried to be there on time but . . . there was times that I couldn't get out of the house . . . ." He further stated: "[T]he medication was making me feel[] drowsiness, sleepy, tired, anxiety. I just felt like everything was going [in] slow motion . . . ." Nonetheless, Galvan acknowledged that he did not tell Mirrett that he needed a change in his schedule. Galvan also stated that he reported to Ruttenberg that he was "sleeping a lot," but the doctor neither changed Galvan's restrictions nor provided him with documentation to support an accommodation.

On April 4, 2011, Galvan received a second notice, stating that he had failed to complete night closing tasks on time. According to the notice, Galvan's performance had increased "overtime and payroll" and created morale problems. The notice further informed Galvan that for two weeks other managers would assist him in closing the warehouse, and that he would potentially be subject to termination if he failed to improve his performance.

After receiving the notice, Galvan met with Kakuk and Mirrett, who asked him to suggest a "plan for improvement." On the portion of the notice for employee responses, Galvan promised in writing to be more "visible" and "more vocal" to his co-workers, and to seek assistance "when needed to help finish [his] duties." Although Galvan testified that at, or before, the meeting, he told Mirrett

10

that he was having a hard time "because of [his] medication[]," he acknowledged that he did not request any type of help from Costco during or after the meeting.

The third notice, dated April 19, 2011, stated that Galvan had repeatedly arrived late for work, thereby compelling the warehouse's morning employees "to stay over their scheduled shifts to wait for him in order to communicate the plan for the evening [employees]." The notice further warned Galvan that any additional issue would result in the termination of his employment.

After receiving the notice, Galvan met that same day with Mirrett and Dena Rodgers, an assistant warehouse manager. At the meeting, Galvan provided the following written response: "'I will make a better effort on making it [in] on time . . . . I do need help getting FMLA paperwork and submitting it in [order] to help me out *with my father*[*'s*] *illness* . . . . This would help out completely.'" (Italics added.) Galvan was given paperwork to request FMLA leave, but he did not submit it until more than a month later, on May 23, 2011, after Costco had decided to terminate his employment.

Although Galvan testified that at the time of the third notice, he continued to have issues with his medication, he could not recall whether he told Mirrett or Rodgers that he needed the FMLA leave to deal with those issues; in addition, he acknowledged that he never told Kakuk that he needed an accommodation regarding his medication. Galvan further stated that he did not then ask Ruttenberg for documentation to support any accommodation related to the medication, and that Ruttenberg never suggested that he should take additional leave.

Following the third notice, Galvan arrived late for seven of the 12 shifts he worked prior to May 7, 2011. Kakuk decided to initiate Galvan's termination, and discussed it with Shawn Parks, a Costco vice president. On May 12, Kakuk issued a counseling notice to Galvan and met with him. Mirrett was also present.

11

The counseling notice stated that Galvan had been suspended pending an investigation, and that he faced possible discharge. The notice noted that Galvan had not completed the FMLA paperwork he had requested, and that he had been provided the phone number for the "Care Network," Costco's employee assistance hotline. Regarding the grounds for Galvan's suspension, the notice described Galvan's repeated tardiness, and further stated: "[Galvan] has to be supervised by upper [m]anagement and peers alike. He has created a situation . . . that has had employees and [m]anagers stay after their scheduled shifts due to his poor decision making and lack of follow-through. He oversees the floor crew, but doesn't interact or follow-up with them. . . . His time management skills have us running around [at the] last minute trying to complete the work [he] should be accomplishing."

During the meeting, Galvan proposed the following "[p]lan to correct behavior" on a portion of the notice for employee remarks: "Calling Care Network and work with medical doctors." In addition, he provided the following written response: "Yes, I have had problems that I haven't resolved. I have a medical condition that requires me [to] tak[e] different meds and feel that my mind [and] body is not where it was . . . . I was afraid, embarrassed to tell the staff that meds are being changed and adjusted. Hopefully, I can get help to get me back to who I was. [¶] My condition is ongoing and I feel . . . that it was only a bandage on it, but continues with the issues that I have. I want to be a hundred percent dedicated to my family and Costco right now. I'm not close to either. . . ."

Galvan acknowledged that at the time of the May 12 meeting, he had never asked Ruttenberg to recommend that he be subject to any work restrictions. In response to an inquiry whether prior to May 12, Galvan asked Ruttenberg for a note adjusting his restrictions, Galvan answered: "No. . . . [Ruttenberg] had been *changing my meds* and *that's the way we thought we were going to be able to deal*

*with this*." (Italics added.)  Galvan further testified that at some point after the May 12 meeting, he discussed an FMLA leave with Ruttenberg, although he could not recall when he did so.

Ruttenberg testified in his deposition that on May 11, the day before Galvan met with Kakuk and Mirrett, Ruttenberg conducted a regularly scheduled appointment with Galvan; this was Ruttenberg's first contact with Galvan following his previous appointment on March 30.  After Galvan reported that his medication had improved his functioning in several ways, Ruttenberg decided to adjust the dosage.  According to Ruttenberg, although Galvan was having "difficulty functioning in the workplace," Galvan never suggested that he needed leave or any other work-related accommodation or restriction.  Ruttenberg had no recollection that Galvan presented him with FMLA paperwork regarding a leave.  Ruttenberg further testified that his next contact with Galvan occurred on May 21, when they first discussed a leave.

On May 12, Kakuk placed Galvan on a seven-day unpaid suspension, and discussed Galvan's discharge with several persons who had witnessed his conduct.  Kakuk then referred the discharge to Parks, who forwarded it to Denis Zook, a Costco executive vice president.  Parks and Zook approved Galvan's discharge.  In addition, Brenda Weber, a Costco personnel director, informed Kakuk that there was sufficient documentation to support Galvan's discharge.  On May 19 and 20, Kakuk made phone calls to Galvan to set up a meeting for May 23.[4]

---

[4]     As noted later in our discussion (see pt. D.2.iv., *post*), there is some dispute whether the discharge decision was made May 16 or 17.  Kakuk testified, however, that the decision was made during the seven-day suspension period (ending May 19), and he submitted a declaration stating that he called Galvan on May 19 and 20 to set up the May 23 "termination meeting" at which he intended to communicate Costco's decision to Galvan.

13

On May 21, the day after speaking with Kakuk, Galvan phoned Ruttenberg to discuss an FMLA leave. Galvan failed to appear at the May 23 meeting, but that same day faxed Kakuk a request for an FMLA leave. Costco then sent Galvan his discharge paperwork and final check.

### 3. *Galvan's Showing*

In opposition to summary judgment, Galvan contended there were triable issues regarding whether Costco knew that following his leave, he suffered from a disability or medical condition and sought a reasonable accommodation. Galvan offered the following version of the underlying facts: From 1999 to 2009, he received praise for his work and was promoted several times. In 2009 and 2010, while employed at the Canoga Park warehouse, he began to suffer from what was later diagnosed as depression, anxiety, and panic. In June 2010, he received treatment in an emergency ward for abdominal pain related to stress.

On August 31, 2010, after being "written up" for excessive tardiness, Galvan was demoted to a junior night manager and transferred to the Simi Valley warehouse. The demotion caused Galvan considerable distress and anxiety, for which he sought medical treatment. Galvan informed Costco that he had significant emotional and mental issues, and that he suffered from anxiety.

From September 1, 2010 to March 7, 2011, Galvan took a medical leave to deal with major depression, anxiety, and panic disorder. While on leave, Galvan sent Costco copies of medical records from Ruttenberg stating that Galvan suffered from "severe depression" and anxiety, and was taking certain medications. In March 2011, when Ruttenberg released Galvan to work without restriction, the release form identified Ruttenberg as a psychiatrist.

Galvan maintained there was considerable evidence that after he returned from the leave, Costco knew he needed a reasonable accommodation to deal with

14

the side effects of the medication for his depression.  Galvan pointed to evidence that he told Mirrett and Kakuk that his medication affected his performance and that he was attempting to adjust the medication.  Galvan also submitted evidence that no later than his May 12, 2011 meeting with Kakuk, both Kakuk and Weber knew that Galvan attributed his deficient performance to his depression medication.

According to Weber's records, on May 10, 2011, Galvan informed her by e-mail that he had seen a doctor because he had awakened with chest pains.  In addition, Galvan stated that he had an appointment the next day with his "other Dr."  On May 11, Weber conversed with someone -- apparently Kakuk -- who stated:  "[Galvan] told my [assistant manager] that he's on meds for depression.  Never said that depression is why he's late."

Later, after Kakuk conducted his May 12 meeting with Galvan, Kakuk talked to Weber.  According to Weber's records, Kakuk made the following remarks:  "[H]e's on [six] dif[ferent] meds due to demotion[.]  [H]e had anxiety and depression[.]  [H]asn't been able to get meds right . . . .  [S]aid he didn't tell us because embarrassed by it.  Had same issues before demoted and before meds (late, poor work performance)[.] . . .  Had thoughts of suicide while on [leave].  Not feeling that way now.  He says he needs help."  Weber's records also reflect the following remark by Kakuk:  "[Galvan] says the FMLA paperwork is at [doctor's] as of May 11[]."

### 4.  *Trial Court's Rulings*

In assessing Galvan's FEHA claims, the trial court determined there were triable issues regarding whether Costco knew that Galvan had a disability before it decided to discharge him.  The court nonetheless ruled that summary adjudication on the FEHA claims was properly granted, concluding that Galvan requested no

15

accommodation regarding his disability, and that Costco's decision to discharge him was based solely on legitimate, nondiscriminatory reasons.

### D. *Analysis*

For the reasons discussed below, we see no error in the trial court's determinations. The focus of our inquiry is initially on Galvan's key claims, that is, the "reasonable accommodation" claims and the claim that he was discharged for a discriminatory reason.

#### 1. *Costco's Knowledge of a Disability*

We begin with an issue central to those claims, namely, whether Costco was aware that Galvan had a disability. Although Costco challenged Galvan's discrimination claim on the ground that it was unaware of his disability (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236-237 (*Brundage*) [disability discrimination claims fail when employer is ignorant of disability], that challenge was also relevant to his "reasonable accommodation" claims, as the statutory provisions underlying those claims predicate employer liability on a "known" disability (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252-1253 (*Avila*); § 12940, subds. (m), (n)).

Under FEHA, the term "[m]ental disability" includes "any mental or psychological disorder or condition[] such as . . . emotional or mental illness . . . that limits a major life activity." (§ 12926, subd. (j)(1).) Here, FEHA specifies that "'[l]imit[]' shall be determined without regard to mitigating measures[] such as medications . . . *unless* the mitigating measure *itself* limits a major life activity." (§ 12926, subd. (j)(1)(a), italics added.) In addition, FEHA states that a mental disorder "limits a major life activity" when it makes "achievement" of that activity

"difficult," and defines "'[m]ajor life activities'" to include "working." (§ 12926, subds. (j)(1)(B), (j)(1)(C).)

Here, the record discloses evidence that following Galvan's leave, Costco knew that he had taken the FMLA leave to address depression and anxiety, that he returned to work after the leave under the care of a psychiatrist, that he had been prescribed medication to control his depression, and that his medication's side effects influenced his performance at work. Although nothing in the record suggests that Costco received any medical information, reports, or requests from Ruttenberg following Galvan's leave, there is evidence that Galvan discussed his medication and its side effects with his supervisors. Accordingly, in view of the statutory provisions described above, the trial court correctly determined that there were triable issues regarding Costco's knowledge of a disability, that is, whether following the leave, Costco knew that Galvan was treating his depression with medication that influenced his performance as an employee.

### 2. *"Reasonable Accommodation" Claims*

We turn to Galvan's claims that Costco failed to engage in an interactive process regarding a reasonable accommodation, and failed to provide such an accommodation. Unlike Galvan's discrimination claim (see pt. D.3., *post*), those claims require no showing that Costco made an unfavorable decision regarding the terms of Galvan's employment -- for example, that it discharged him -- or that it acted on the basis of a discriminatory motive. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 442 (*King*); *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 256 (*Jensen*).) The "reasonable accommodations" claims themselves are also distinct, as they involve "different proof of facts. [Citation.] The purpose of the interactive process is to determine what accommodation is required. [Citation.] Once a reasonable accommodation has been granted, then the

17

employer has a duty to provide that reasonable accommodation. [Citation.]" (*A.M. v. Albertsons LLC* (2009) 178 Cal.App.4th 455, 464.) Nonetheless, although the claims are independent, "each necessarily implicates the other." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54 (*Gelfo*).)

We conclude that summary adjudication was properly granted on both claims due to fatal deficiencies directly related to the "'interactive process'" claim. Generally, an employer is not required to provide an accommodation when that omission is due to the employee's failure to present information -- in the form of a request for an accommodation, or in some other way -- sufficient to initiate the interactive process (*King*, *supra*, 152 Cal.App.4th at pp. 442-444), or when the employer "did everything in its power to find a reasonable accommodation, but the . . . interactive process broke down because the employee failed to engage in discussions in good faith" (*Jensen*, *supra*, 85 Cal.App.4th at p. 263). As explained below (see pt. D.2.iii., *post*), the evidence established (1) that Galvan never requested an accommodation or otherwise triggered Costco's obligation to engage in the interactive process required under FEHA, and (2) that Costco nonetheless engaged in an "interactive process" that broke down due to Galvan's conduct.

### i. *Employee Duties Regarding the "Interactive Process"*

"The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively." (*Wilson, supra,* 169 Cal.App.4th at p. 1195.) Reasonable accommodations may include adjustments to the employee's work schedule, transfers to a vacant position, and leave. (*Id*. at pp. 1193-1194.)

Under FEHA, the employee must initiate the interactive process "unless the disability and resulting limitations are obvious." (*Scotch*, *supra*, 173 Cal.App.4th

18

at p. 1013.)  Although the regulations accompanying FEHA state that employers have an "affirmative duty" to offer reasonable accommodations to employees with a known disability, the regulations recognize that in some instances, no accommodation can be identified or implemented unless the interactive process is triggered.  (Cal. Code Regs., tit. 2, §§ 11068, subd. (a), 11069, subd. (a).)  The regulations further provide that absent exceptional circumstances not present here, the employer must initiate the interactive process when the employee requests an accommodation, or when the employer "becomes aware of the need for an accommodation through a third party or by observation . . . ."  (Cal. Code Regs., tit. 2, § 11069, subds. (b)(1), (b)(2).)

"Typically, an . . . employee triggers the employer's obligation to participate in the interactive process by requesting an accommodation.  [Citation.]  Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation."  (*Gelfo, supra,* 140 Cal.App.4th at p. 62, fn. 22.)  Nonetheless, "'the interactive process of fashioning an appropriate accommodation lies primarily with the employee.'  [Citation.]  An employee cannot demand clairvoyance of his employer.  [Citation.]  '"[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. . . . ."'  [Citation.]  'It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee.'"  (*King*, *supra*, 152 Cal.App.4th at p. 443.)

In *King*, a truck driver was transferred from a daytime shift to a more demanding evening schedule.  (*King, supra,* 152 Cal.App.4th at p. 434.)  After he was diagnosed with a blood disorder, he took a five-month medical leave.  (*Ibid*.)

19

Upon returning from the leave, the driver presented a note from his doctor, stating that he was released to perform his regular duties and hours. (*Id*. at p. 444.) The driver was returned to his evening schedule, and later discharged. He asserted disability-related FEHA claims, alleging that his employer failed to accommodate his blood disorder. (*Id*. at pp. 442-444.) The trial court granted summary judgment on the claims, reasoning that the driver neither made a specific request for a necessary accommodation nor presented a "concise list of restrictions." In affirming the summary judgment, the appellate court noted that the driver neither communicated his disorder-related work distress to his supervisors nor clarified his medical restrictions. (*Id*. at p. 443.) The court stated: "We agree with the trial court that plaintiff has not sustained his burden of demonstrating a genuine issue of material fact given his failure to get additional clarification from his doctor . . . and to communicate his limitations to his supervisors." (*Id*. at p. 444.)

Furthermore, under FEHA, the employee, like the employer, is subject to an additional obligation after the interactive process has been initiated. "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' [Citation.] 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.' [Citation.]" (*Scotch*, *supra*, 173 Cal.App.4th at p. 1014.) Under the "good faith communication" requirement, "[a] party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." (*Beck v. Univ. of Wis. Bd. of Regents* (7th Cir. 1996) 75 F.3d

1130, 1135; accord, *Humphrey v. Memorial Hospitals Association* (9th Cir. 2001) 239 F.3d 1128, 1137 (*Humphrey*).)

### ii. *Relevant Evidence*

Viewed in the light most favorable to Galvan, the evidence shows that after Ruttenberg released Galvan for work without any restrictions in early March 2011, his work performance at the warehouse was deficient. His tardiness impaired the transition between the morning and evening shifts, and he failed to perform key tasks during his shift. At some point, his supervisors also became aware that Galvan was taking medication that influenced his work performance.

Through Costco's "counseling notice" process, Galvan's supervisors repeatedly met with him, described his performance deficiencies, and asked him to propose how they could be resolved. Throughout that process, Galvan never requested any accommodation, general or specific, related to his medication. During the meetings on March 23 and April 4, 2011, Galvan did not mention the medication, and proposed to improve his performance without assistance from Costco. At the April 19, 2011 meeting, Galvan again did not refer to his medication, and instead requested paperwork for an FMLA leave to help him deal with his father's illness, which he said would "help out completely." After the meeting, Costco gave him the FMLA paperwork, but over the course of the next four weeks he failed to submit any request for a leave.

Galvan discussed his medications at the final meeting on May 12, 2011, when he was placed on a seven-day unpaid suspension pending an investigation regarding his potential discharge. Galvan stated that he had forwarded the FMLA paperwork to Ruttenberg and that he needed "help to get [him] back to who [he] was." However, when asked to offer a plan to resolve his performance deficiencies, Galvan stated only that he would call the Care Network -- Costco's

21

employee hotline -- and "work with medical doctors." Furthermore, during the suspension period, he did not request a leave or any other accommodation, even though he knew that he faced possible discharge.

Although there is evidence that on May 12, Galvan told Kakuk and Mirrett that he needed "help" and had sent the FMLA paperwork to Ruttenberg, nothing in the record supports the reasonable inference that he then manifested a desire or need for an accommodation *from Costco*. According to Galvan's written response to the May 12 notice, the help he sought was to "get . . . back to who [he] was" through the adjustment of his medication; indeed, his proposed course of action was to "work with" his doctors. Furthermore, there is no evidence that Galvan and Ruttenberg discussed any possible accommodation from Costco until after Costco decided to discharge him and after Galvan had been summoned to a meeting set for May 23. According to Galvan's and Ruttenberg's own testimony, prior to May 21, when Galvan asked Ruttenberg to help him obtain a leave, Galvan and Ruttenberg were attempting to resolve Galvan's problems independently of Costco, that is, by adjusting his medication.

### iii. *Propriety of Summary Adjudication*

On the evidence described above, the trial court concluded there were no triable issues whether Galvan triggered Costco's obligation to engage in an interactive process. We agree with that determination. In *Taylor v. Principal Financial Group, Inc.* (5th Cir. 1996) 93 F.3d 155, 158-161, the plaintiff, a sales manager, was repeatedly criticized by his employer for poor performance. Although he told his employer that he suffered from bipolar disorder and asked for a reduction in his performance goals and "a lessening of the pressure," he identified no limitations or restrictions imposed by his illness, and indicated that he could meet his job requirements. (*Id*. at pp. 165-166.) After the employer

22

responded by giving him six months to meet certain specified goals, he asserted ADA claims, alleging, inter alia, that his employer had failed to engage in an interactive process to determine a reasonable accommodation.  (*Ibid.*)

In affirming summary judgment on the claims, the Fifth Circuit concluded there was no triable issue whether the plaintiff triggered the employer's duty to engage in an interactive process:  "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.  It simply stands to reason that the employee and his health-care provider are best positioned to know what type of accommodation is appropriate for the employee.  When the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider, a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation."  (*Taylor*, *supra*, 93 F.3d at p. 165.)

The reasoning of *Taylor* applies here.  Although Costco was aware of Galvan's medical history and that his depression medication influenced his performance, any limitations arising from the medication and the resulting reasonable accommodations, were "'not open, obvious, and apparent'" to Costco. (*Scotch*, *supra*, 173 Cal.App.4th at p. 1013.)  Galvan's tardiness disrupted operations at the Simi Valley warehouse, as did his failure to perform key tasks during his shift.  Because he arrived late for his evening shift, he interfered with the transition between the morning and the evening shift workers.  During his shift, employees lost contact with him because he turned off his radio; moreover, he

23

failed to complete closing tasks in a timely and adequate manner. Because Galvan's shift began in the afternoon, it was not obvious how to resolve his tardiness; similarly, it was not obvious how to address his other deficiencies. The burden thus fell on Galvan to specify his limitations and identify some possible accommodations that he desired; he failed to do so. As explained above (see pt. D.2.ii., *ante*), prior to Costco's discharge decision, Galvan never requested a leave or any other accommodation, and never provided Costco with information from Ruttenberg regarding his limitations or a possible accommodation.

Summary adjudication was also proper for another reason, namely, that Costco's "counseling notice" process, as applied to Galvan, effectively constituted an interactive process that broke down due to Galvan's failure to participate in it.[5] In *Tatum v. Hospital of the Univ. of Pa.* (E.D. Pa. 1999) 57 F.Supp.2d 145, a nursing assistant asserted an "interactive process" ADA claim against the hospital that employed her. At trial, the nursing assistant presented evidence that after developing a cyst, she felt pain while lifting and moving patients. (*Id*. at pp. 147-148.) From 1973 to 1994, she was able to perform those essential tasks of her position, with some assistance provided as an accommodation by the hospital. (*Ibid*.) In 1994, she told her supervisor that she was having difficulty lifting and pulling heavy patients. (*Ibid*.) The hospital repeatedly asked her to obtain

---

[5] We may affirm the summary adjudication on a ground not relied upon by the trial court, provided that the parties have had an adequate opportunity to address that ground. (*Bain v. Moores* (2009) 172 Cal.App.4th 445, 471, fn. 39; Code Civ. Proc., 437c, subd. (m)(2).) That requirement is satisfied here, as Costco asserted the ground discussed above before the trial court and on appeal, and Galvan presented his views regarding the alternative ground in his reply brief. (*Bain v. Moores*, *supra*, 172 Cal.App.4th at p. 471, fn. 39.)

information from her doctor detailing her physical capabilities and limitations, but she failed to do so. (*Ibid*.) When she refused to lift patients, the hospital placed her on an unpaid suspension. The trial court granted judgment on her "interactive process" claim as a matter of law, concluding that the hospital acted in good faith during the interactive process, and that the nursing assistant failed to provide the medical information necessary to identify a reasonable accommodation.

Here, the record establishes that Galvan failed to meet the "good faith communication" requirement relating to the interactive process. The evidence shows that Costco repeatedly met with Galvan to discuss his performance deficiencies. At his request, Costco gave him FMLA paperwork for a leave, predicated not on his own condition, but on his father's illness. Even then, Galvan failed to submit the paperwork until more than a month had passed and Costco had already determined to discharge him. Galvan did not, in fact, discuss a leave or any other accommodation with Ruttenberg. Indeed, even after the final meeting on May 12, 2012, when Galvan told his supervisors that he intended to work with Ruttenberg, and that he had forwarded the FMLA paperwork to him, Galvan discussed no accommodation with Ruttenberg until May 21, after the seven-day suspension period had expired and after he had been summoned to the May 23 meeting. In our view, Galvan's delays and failure to communicate cannot be regarded as good faith participation in an interactive process.

### iv. *Galvan's Contentions*

Galvan contends that Costco's knowledge of his disability, coupled with his other conduct, was sufficient to trigger Costco's obligation to engage in an interactive process. He relies on decisions regarding the FEHA and the ADA standing for the proposition that the employer must explore reasonable accommodations once it has sufficient information -- in any suitable form --

25

regarding the employee's disability, and his desire or obvious need for an employer-provided accommodation.[6] We accept that broad proposition. As explained above (see pt. D.2.iii., *ante*), however, despite repeated opportunities to communicate "the nature of the disability, resulting limitations, and necessary accommodations," Galvan did not do so. (*Taylor*, *supra*, 93 F.3d at pp. 165-166.) Because those facts were not obvious to Costco, Galvan failed to trigger the interactive process required under FEHA.

There is no evidence that Costco disregarded information that amounted to a request for an accommodation from Costco, or that rendered obvious a desire or need for such an accommodation. Galvan knew how to ask for an accommodation, as he was a long term employee with managerial experience and knowledge of Costco's leave policies; moreover, as we elaborate below, nothing before us

---

[6]　　*Wysinger*, *supra*, 157 Cal.App.4th at p. 426 [under FEHA, employer must engage in good faith interactive process to identify specific accommodation when employee with known lupus and arthritis requests an accommodation]; *Prillman v. United Air Llines, Inc.* (1997) 53 Cal.App.4th 935, 953 [FEHA requires employers to work with disabled employees to accommodate their needs]; *Barnett v. U.S. Air, Inc.* (9th Cir. 2000) 228 F.3d 1105, 1111, vacated on other grounds by *U.S. Airways, Inc. v. Barnett* (2002) 535 U.S. 391, 404 [under the ADA, "an employer has a mandatory obligation to engage in the interactive process and . . . this obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation"]; *Taylor v. Phoenixville School Dist.* (3d Cir. 1999) 184 F.3d 296, 313 (*Phoenixville School Dist.*) [employer must explore accommodations when "the employer can be fairly said to know of both the disability and desire for an accommodation"]; *Diaz v. Federal Express Corp.* (C.D. Cal. 2005) 373 F.Supp.2d 1034, 1041-1042, 1054-1055, 1064 (*Diaz*) [no express request for accommodation was required when employer received psychiatrist's report specifying employee's mental disorder and recommending modification of work responsibilities]; *Norris v. Allied-Sysco Food Service, Inc.* (N.D. Cal. 1996) 948 F.Supp. 1418, 1436 [employee need not expressly request accommodations when "[the] disability and the need to accommodate it are obvious"]; *Schmidt v. Safeway, Inc.* (D. Or. 1994) 864 F.Supp. 991, 997 [employee need not speak "magic words" to trigger inquiry into accommodations].)

suggests that his disability impaired his ability to request an accommodation. Furthermore, Costco's "counseling notice" process afforded Galvan an opportunity to ask for help from Costco to resolve performance deficiencies based on personal problems. Indeed, at the April 19, 2011 meeting, when Galvan attributed his deficiencies to his father's illness and asked for FMLA paperwork, Costco immediately provided it. Yet at the four "counseling notice" meetings, Galvan proposed no course of action relating to his disability that required action by Costco. Furthermore, Costco cannot reasonably be regarded as having ignored an obvious need for an accommodation when neither Galvan nor his doctor perceived that need, as Galvan never discussed obtaining an accommodation from Costco with Ruttenberg prior to May 21. On this record, we see no triable issue whether Costco had adequate notice that Galvan requested or needed an accommodation relating to his disability.[7]

---

[7] In a related contention, Galvan challenges the trial court's determination that he admitted during his deposition that he never requested an accommodation from March 2011 to the date of his termination. The court appears to have concluded that Galvan's testimony constituted a judicial admission regarding that matter. Galvan contends his testimony did not rise to a judicial admission, as it did not conclusively nullify the possibility that he made an express request for some type of accommodation to some supervisor. It is unnecessary for us to resolve his contention, as, for the reasons discussed above, there are no triable issues whether Galvan requested an accommodation or otherwise triggered the interactive process required under FEHA. Those determinations are sufficient to support summary adjudication on his "reasonable accommodation" claims.

Galvan's reply brief suggests that the specific accommodation he requested was additional time for Ruttenberg to adjust his medication. Although there is evidence that Galvan told his supervisors at some point that his medication was being adjusted, nothing in the record raises the reasonable inference that he requested more time in order to complete the adjustments.

Pointing primarily to *Bultemeyer v. Fort Wayne Community Schools* (7th Cir. 1996) 100 F.3d 1281 (*Bultemeyer*) and *Phoenixville School Dist.*, *supra*, 184 F.3d 296, Galvan contends that because he had a mental disability, he was not required to carry the initial burden ordinarily imposed on employees to trigger the interactive process. As explained below, we disagree. Those decisions establish that when an employer knows that the employee's mental disability appears to affect his or her ability to seek an accommodation or provide medical information, the employer must "meet the employee half-way," that is, undertake more responsibility during the interactive process. (*Bultemeyer*, *supra*, 100 F.3d at p. 1285; accord, *Phoenixville School Dist.*, *supra*, 184 F.3d at p. 314.) Thus, during the interactive process, "if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." (*Bultemeyer*, *supra*, 100 F.3d at p. 1285.) Furthermore, during the interactive process, the employer may be obliged to request additional information it believes that it needs, particularly when the employee's "symptoms are flaring." (*Phoenixville School Dist.*, *supra*, at p. 315.)[8]

Galvan maintains there is a triable issue whether his mental disability impaired his ability to initiate the interactive process and participate in it, placing special emphasis on his April 19, 2011 remark to Kakuk that he "needed help getting and submitting" the FMLA paperwork he then requested. However, nothing in the record raises the reasonable inference that Costco was on notice that

---

[8] Galvan also relies on a treatise stating that "[i]f mental illness prevents the employee from requesting an accommodation, the employer must devise one. . . ." (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2013) [¶] 9:1244.2, p. 9-110 (rev. #1 2009).) As discussed above, we find nothing in the record to demonstrate Galvan was incapable of requesting an accommodation.

28

Galvan's mental disability affected his ability to identify or ask for an accommodation. In September 2010, Galvan successfully applied for and obtained an FLMA leave, from which he returned without restrictions. In discussing his medication with supervisors, he attributed his reluctance to disclose the medication solely to embarrassment. On May 12, 2011, when Galvan discussed the FMLA paperwork he had been provided, he told his supervisors that it had been forwarded to his doctor and that he intended to work with his doctor. Furthermore, in opposing summary judgment, Galvan offered no expert medical evidence suggesting that his condition prevented him from seeking an accommodation. Indeed, on May 21, 2011, he asked Ruttenberg to assist him in obtaining a leave, and Ruttenberg complied.

Galvan suggests there is a triable issue whether Costco decided to terminate him before he requested the FMLA leave. That contention fails on the record before us. The record discloses that Galvan first made an appropriate request for an accommodation on May 23, 2011, when Ruttenberg faxed the FMLA leave request to Costco. The record further establishes that Costco made the termination decision before that date. It is undisputed that on May 12, 2011, Galvan received a counseling notice and was placed on a *seven-day* unpaid suspension. The notice stated: "[Galvan] will be suspended[] pending an investigation, and can [*sic*] result in additional disciplinary action, up to and including termination." Although Kakuk could not recall the precise date on which he decided to discharge Galvan, Kakuk testified that the decision was made during the suspension period, i.e., on or before May 19. On May 19 and 20, Kakuk called Galvan to set up a meeting for May 23. Galvan testified that he remembered speaking to Kakuk when he called to set up a meeting, and that instead of appearing at the meeting, he had his wife fax his FMLA leave request to Costco. On May 24, after Galvan failed to appear at

29

the May 23 meeting, Costco sent Galvan a discharge letter stating that he had been terminated on May 16.[9]

Galvan also maintains that Costco was obliged to provide reasonable accommodations even if Galvan requested an FMLA leave after Costco's termination decision. That contention presents an issue of first impression, as our research has disclosed no published decision examining whether FEHA obliges employers to provide accommodations following a termination decision.

We find guidance regarding the contention from *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 971-976, which examined the meaning of the term "reasonable accommodation" for purposes of section 12940, subdivision (m), which requires

---

[9]    In an effort to raise a triable issue whether the discharge decision occurred after Costco received Galvan's leave request on May 23, Galvan points to a May 17, 2011 e-mail from Parks to Kakuk stating that Zook's approval of the discharge would be sought "now." Galvan further notes that Kakuk's phone records regarding his May 19 and 20 calls to Galvan do not expressly identify the meeting that Kakuk set as a "termination" meeting. However, as Parks testified that Zook promptly approved the termination when Parks called him and it is undisputed that Kakuk called Galvan to set up the May 23 meeting a few days before, there is no basis to conclude Costco's decision to discharge Galvan was made after his leave request on May 23. Indeed, Galvan did not consult Ruttenberg about seeking a medical leave until after he had been notified by Kakuk of the May 23 meeting.

Galvan also suggests that certain purported inconsistencies in Costco's records raise a triable issue whether the discharge decision preceded his May 23 leave request. He notes that his final check, which paid for his services through May 23, was dated May 24; that Costco's records reflect two different effective dates for his termination, namely, May 16 and 23; and that Kakuk testified that Costco normally takes 48 hours to prepare a discharged employee's final check. To the extent Galvan suggests the discharge decision might have been made as late as 48 hours before his check was prepared, viz., Sunday, May 22, nothing in the record suggests the departments involved in preparing the final check-- including, according to Kakuk, Costco's central payroll office -- function on Sunday. Even were we to indulge that hypothesis, moreover, this would still put the discharge decision prior to the date Galvan requested leave.

30

employers "'to make reasonable accommodation for the known physical or mental disability of an applicant or employee.'" The issue presented in *Nadaf-Rahrov* was whether that provision imposes liability on an employer for failing to provide an accommodation when no accommodation would enable a disabled employee or applicant to perform the essential functions of the position held or sought. (*Id*. at pp. 971-976.) Following a discussion of the statutory scheme, the appellate court held that "reasonable accommodation" means "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." (*Id*. at p. 974.) As the court explained, that definition ensures that an employer is subject to liability for failing to make a reasonable accommodation only when there is some accommodation that will enable an employee to perform the essential functions of his or her position. (*Id*. at p. 975.)

In view of *Nadaf-Rahrov*, we reject Galvan's contention. Under *Nadaf-Rahrov*, when an employee becomes disabled, the purpose of a reasonable accommodation is to modify workplace conditions so that the employee may *continue* to perform the essential functions of the job held. That purpose is nullified when the employer properly decides to terminate an employee before an accommodation is requested. As we elaborate further below (see pt. D.3, *post*), under the circumstances presented here, Costco's decision to terminate did not contravene FEHA. Accordingly, it would be unreasonable to subject Costco to liability for failing to provide Galvan with an accommodation after it decided to terminate his employment, merely because Galvan requested the accommodation before he formally learned of the decision.

The four ADA decisions upon which Galvan relies are distinguishable. In two of the cases, the appellate court reversed summary judgment in an employer's favor, concluding that the employer was potentially liable for failing to provide an accommodation requested after a termination decision, as the interactive process

31

had broken down due to the employer's misconduct *before* that decision. (*Humphrey*, *supra*, 239 F.3d at pp. 1137-1139 [evidence showed that after employee initiated the interactive process, employer improperly failed to consider reasonable accommodations before discharging employee]; *Bultemeyer*, *supra*, 100 F.3d at pp. 1282, 1285-1286 [evidence showed that when mentally disabled employee returned from leave, employer, who knew employee needed accommodation but did not know how to ask for it failed to obtain information from employee or his psychiatrist regarding accommodation before discharging employee hours before he requested leave].)  In the remaining cases, the court concluded that summary judgment in the employer's favor was improper where there were triable issues whether the employee requested an accommodation before the termination decision.  (*Criado v. IBM Corp.* (1st Cir. 1998) 145 F.3d 437, 440, 443-445 [evidence showed that employer terminated employee without considering employee's accommodation request due to communication breakdown between employee's doctor and employee prior to discharge decision]; *Fromm-Vane v. Lawnwood Med. Ctr., Inc.* (S.D. Fla. 1997) 995 F.Supp. 1471, 1477 [evidence raised triable issues regarding date of termination decision].)  Here, there are no triable issues whether prior to the termination decision, Galvan requested an accommodation or triggered the interactive process.  In sum, summary adjudication was properly granted on both of his "reasonable accommodation" claims.  (*King*, *supra*, 152 Cal.App.4th at pp. 442-444; *Jensen*, *supra*, 85 Cal.App.4th at p. 263.)

### 3. *Discrimination Claim*

We turn to Galvan's discrimination claim.  Under FEHA, discrimination claims, including those based on disability discrimination, are ordinarily evaluated in light of a three-stage burden shifting test.  (*Wills v. Superior Court* (2011) 195

Cal.App.4th 143, 159 (*Wills*); see *Guz v. Bechtel* (2000) 24 Cal.4th 317 (*Guz*).)

Under the test, had Galvan reached trial on his claim, he "would . . . have borne the initial burden of proving unlawful discrimination, under well-settled rules of order of proof:  '[T]he employee must first establish a prima facie [showing] of wrongful discrimination.  If []he does so, the burden shifts to the employer to show a lawful reason for its action.  Then the employee has the burden of proving the proffered justification is mere pretext.'  [Citations.]" (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1730.)

Here, Costco sought summary adjudication regarding Galvan's discrimination claim on two grounds:  (1) that he could make no prima facie showing of discrimination due to Costco's ignorance of his disability (see *Brundage*, *supra*, 57 Cal.App.4th at pp. 236-237 [disability discrimination claim failed absent evidence that employer was aware of disability]); and (2) that there was a legitimate, nondiscriminatory basis for its decision to terminate him.  Because the trial court properly rejected the first ground (see pt. D.1., *ante*), we direct our attention to the second ground.

To establish a legitimate, nondiscriminatory basis for discharging Galvan, Costco relied on its showing related to Galvan's "reasonable accommodation" claims.  Costco contended that its decision to discharge was predicated solely on Galvan's performance.  According to Costco, Galvan's persistent tardiness, which predated his FMLA leave, disrupted operations at the Simi Valley warehouse after his leave, as did his failure to perform key tasks during his shifts.  Although his supervisors repeatedly met with him to resolve his performance deficiencies, he did not do so.  Furthermore, as discussed above (see pt. D.2. iii, *ante*), Galvan neither requested an accommodation nor cooperated with his supervisors to identify some possible accommodation.  In response, Galvan did not attempt to identify evidence establishing that Costco's proffered reasons were a pretext for

33

discrimination. Rather, before the trial court, Galvan argued only that under section 12940, subdivision (a)(1), as a matter of law, termination for disability-related conduct is termination "because of" the disability. On appeal, Galvan reiterates that contention.[10]

The trial court concluded that Costco tendered legitimate nondiscriminatory reasons for the termination, and that Galvan failed to raise triable issues related to pretext or the existence of a discriminatory motive. In so concluding, the court rejected Galvan's contention that Costco's performance-based reasons constituted disability discrimination as a matter of law. As explained below, we agree with those determinations.

As our Supreme Court has elaborated, "'legitimate' reasons [citation] in this context are reasons that are facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination. [Citations.]" (*Guz*, *supra*, 24 Cal.4th at p. 358, italics deleted.) Thus, if an employer's reasons for its conduct are not discriminatory, they "need not necessarily have been wise or correct. [Citation.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*." (*Ibid*.) Because the reasons offered for Costco's termination decision were not discriminatory, they constitute a facially proper basis for that decision.

The burden on summary judgment thus shifted to Galvan to demonstrate that Costco's "actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361.)

---

[10] Galvan's reply brief suggests there are triable issues regarding the gravity of his performance deficiencies. By failing to raise the argument in his opening brief, he has forfeited the contention. (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, pp. 769-771.)

To carry that burden, Galvan was required to offer "substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.) As the trial court correctly noted, Galvan failed to do so.

We reject Galvan's contention that under the circumstances of this case, Costco's performance-based reasons for its decision was discrimination as a matter of law. For the reasons discussed above (see pt. D.2. iii, *ante*) under FEHA, Galvan was obliged to trigger the interactive process -- by a request, or in some other suitable manner -- and participate in it in good faith; he did not do so. Accordingly, the issue presented is whether Costco's performance-based reasons for discharging Galvan constituted discrimination when he failed to make his need for an accommodation known.

As no reported decision has addressed that issue under FEHA, we look to federal decisions regarding the ADA. In *Siefken v. Village of Arlington Heights* (7th Cir. 1995) 65 F.3d 664, 666 (*Siefken*), a municipality hired a police officer with diabetes believing that he had the condition under control. The officer failed to monitor his condition and blacked out while driving a patrol car, but was pulled over before he caused any damage. (*Id.* at p. 665.) After his discharge, he initiated a discrimination action under the ADA, which was dismissed for failure to state a claim. (*Siefken, supra,* 65 F.3d at p. 666.) In affirming that ruling, the Seventh Circuit noted that the only accommodation the officer proposed was requested after his termination, namely, a "'second chance'" at controlling his condition. (*Id.* at pp. 666-667.) The Seventh Circuit stated: "[W]hen an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to

35

meet 'the employer's legitimate job expectations' [citation] due to his failure to control a controllable disability, he cannot state a cause of action under the ADA." (*Id.* at p. 667.)

We reach the same conclusion here regarding Galvan's FEHA claim. In interpreting FEHA, we seek a reasonable interpretation that is consistent with the apparent legislative intent, "'and which, when applied, will result in wise policy rather than mischief or absurdity.'" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1392, quoting *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1136, fn. 11.) Here, there is evidence that Costco knew Galvan was taking depression medication that influenced his performance. Nonetheless, as explained above (see pt. D.2.iii, *ante*), under the circumstances presented here, Galvan had the burden under FEHA of establishing his need for an accommodation. Prior to Costco's termination decision, Galvan requested no accommodation or change in his duties to allow him to address the performance deficiencies repeatedly identified by Costco and acknowledged by Galvan himself. He did not trigger an interactive process, and failed to participate adequately in the interactive process that Costco nonetheless conducted.

In view of *Siefken*, Costco's performance-based reasons for discharging Galvan did not constitute discrimination under FEHA. To conclude otherwise would be to hold that employees with a known disability who neither request an accommodation nor implement the interactive process, despite an adequate opportunity to do so, may not be discharged for deficient job performance when their disability influences their performance. Because that interpretation of FEHA would place an unreasonable burden on employers, we reject it. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1392.)

36

Galvan's reliance upon certain federal decisions for the contrary position is misplaced. In several of those cases, the court concluded that summary judgment in the employer's favor was improper on the disabled employee's discrimination claim, notwithstanding the employer's evidence that it had performance-based reasons for its employment decision, when there was evidence that the employee requested an accommodation or initiated the interactive process before the decision.[11] In the remaining cases, the court concluded that absent special

---

[11] *McMillan v. City of New York* (2d. Cir. 2013) 711 F.3d 120, 128-129 [reversing summary judgment in employer's favor on ADA discrimination claim after determining that triable issue existed whether employer failed to accommodate mental disability]; *Dark v. Curry County* (9th Cir. 2006) 451 F.3d 1078, 1088-1089 [reversing summary judgment in employer's favor on ADA discrimination claim after employee, a heavy equipment operator, was discharged following an epileptic seizure, when employee proposed accommodations to permit him to retain position]; *Humphrey*, *supra*, 239 F.3d at pp. 1138-1140 [reversing summary judgment in employer's favor on ADA discrimination claim after determining that triable issues existed whether employer failed to accommodate mental disability; noting that "[t]he link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability"]; *Ward v. Massachusetts Health Research Institute* (1st Cir. 2000) 209 F.3d 29, 37-38 [reversing summary judgment in employer's favor on ADA discrimination claim after determining that triable issues existed whether employer failed to accommodate disability]; *Borkowski v. Valley Cent. School Dist.* (2d Cir. 1995) 63 F.3d 131, 142-144 [same; noting that "[f]ailure to consider the possibility of reasonable accommodation . . . , if it leads to discharge for performance inadequacies . . . , amounts to a discharge solely because of the disabilities"]; *Ambrose v. J. B. Hunt Transport, Inc.* (D. Or. 2014, Feb. 13, 2014, Case No. 3:12-cv-01740 - HU) 2014 U.S. Dist. LEXIS 18361, *44-*59 [declining to grant summary judgment in employer's favor on Oregon state law disability discrimination claim after determining that triable issues existed whether employer failed to accommodate disability and engage in interactive process]; *Brown v. City of Salem* (D. Or., Feb. 27, 2007, Civil No. 04-1541-HA) 2007 U.S. Dist. LEXIS 14738, *9-*23 [declining to grant summary judgment in employer's favor on ADA disability discrimination claim, as there were triable issues whether employer discharged employee for sleeping on the job caused by his involuntary "microsleeps" disorder, for which the employee had sought and received accommodations]; *Diaz*, *supra*,

*(Fn. continued on next page.)*

37

conditions, mentally disabled employees may not be discharged for disability-caused misconduct unrelated to the performance standards for the employee's job.[12] The cases thus address factual circumstances not presented here.

Galvan also directs our attention to *Wills*. There, a court clerk who suffered from bipolar disorder controlled her condition through psychiatric care and medication (*Wills, supra,* 195 Cal.App.4th at p. 149.) Her employer was aware of her disorder, as she took several medical leaves to deal with it. (*Ibid*.) After she made threatening remarks to some employees, she took a medical leave, during which she sent threatening e-mails to other employees. (*Id*. at pp. 149-151.) When she returned from the leave, she was discharged for making the threats. (*Id*. at pp. 151-153.) After she initiated a discrimination action under FEHA, the trial

---

373 F.Supp.2d at pp. 1062, 1064-1065 [declining to grant summary judgment in employer's favor on FEHA disability discrimination claim after determining that triable issues existed whether employer failed to accommodate disability and engage in interactive process].)

[12] *Gambini v. Total Renal Care, Inc.* (9th Cir. 2007) 486 F.3d 1087, 1093, 1094 [concluding that under Washington discrimination law, mentally disabled employee discharged for emotional outburst was entitled to jury instruction that "[c]onduct resulting from a disability is part of the disability and not a separate basis for termination," in order to permit jury to assess whether employee's "personality[,] and not her work product[,]" motivated termination]; *Den Hartog v. Wasatch Academy* (10th Cir. 1997) 129 F.3d 1076, 1085-1086 & fn. 8 [concluding that under the ADA, mentally disabled employees may be held to legitimate performance criteria when given the opportunity to do so "by reasonable accommodation," but that employers must otherwise tolerate "eccentric or unusual conduct" caused by the disability]; *Equal Empl. Opportunity Commision v. Walgreen Co.* (N.D. Cal., Apr. 11, 2014, Case No. 11-cv-04470-WHO) __ ___ F.Supp.2d __, __ [2014 U.S. Dist. LEXIS 52061, *24-*32] [declining to grant summary judgment in employer's favor on ADA disability discrimination claim, notwithstanding employer's evidence it fired diabetic employee who took food without prior payment to deal with sudden hypoglycemic episode, when there were triable issues whether employer made adequate accommodation for employee's known need to resolve such episodes].)

court granted summary judgment on her claims. (*Wills, supra,* at pp. 152-153.) In affirming that ruling, the appellate court held that "FEHA does not prohibit an employer from distinguishing between disability-caused misconduct and the disability itself when the misconduct involves threats or violence against coworkers . . . ." (*Id*. at p. 167.) The court limited its holding, stating that it "express[ed] no opinion on whether FEHA permits an employer to distinguish between disability-caused misconduct and the disability itself in any factual setting . . . ." (*Id*. at p. 166.) Accordingly, *Wills* cannot reasonably be regarded as construing FEHA to prohibit Costco from discharging Galvan under the circumstances presented here. In sum, the trial court properly granted summary adjudication on Galvan's discrimination claim.

### 4. *Other Claims*

In view of the conclusions discussed above, summary adjudication was also properly granted on Galvan's other claims. His FEHA claim for failure to prevent discrimination is fatally defective for want of a showing of actual discrimination. (*Scotch*, *supra*, 173 Cal.App.4th at p. 1021; *Trujillo v. North County Transit Dist*. (1998) 63 Cal.App.4th 280, 289.) For similar reasons, his claim for wrongful termination in violation of public policy fails, as it is predicated on the same facts as his FEHA claims. (See *Avila*, *supra*, 165 Cal.App.4th at p. 1261; *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 612-613.) Finally, summary adjudication on his underlying claims precludes his recovery of punitive damages. (See *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 60.)

## DISPOSITION

The judgment is affirmed.  Costco is awarded its costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.